J-A06036-25                    2025 PA Super 101

| | | |
|---|---|---|
| ERNEST CARANCI AND CARMELA CARANCI | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MONSANTO COMPANY, BAYER AG, S&H HARDWARD AND SUPPLY COMPANY, PENN HARDWARD, INC., PENN HARDWARE TWO, INC. | : | No. 993 EDA 2024 |
| | : | |
| APPEAL OF: MONSANTO COMPANY | : | |

Appeal from the Judgment Entered March 11, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 210602213

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and DUBOW, J.

OPINION BY DUBOW, J.:                    **FILED MAY 8, 2025**

Appellant, Monsanto Company ("Monsanto"), appeals from the $177,285,102.74 judgment entered in the Philadelphia County Court of Common Pleas on March 11, 2024, following a jury verdict in favor of Appellees, Ernest Caranci ("Mr. Caranci") and Carmela Caranci (collectively, "Appellees"), in this products liability action. Monsanto challenges the trial court's denial of its motions for a new trial or judgment notwithstanding the verdict based on Monsanto's allegations of improper communications between court staff and jurors, erroneous evidentiary rulings, and federal preemption, and claims that the jury's damages award was excessive. After careful review, we affirm.

The relevant facts and procedural history are as follows. In June 2021, Appellees sued Monsanto alleging that Mr. Caranci's years'-long use of Monsanto's product Roundup and its ingredient glyphosate caused him to develop non-Hodgkin's lymphoma ("NHL"). Appellees' complaint alleged claims of, *inter alia*, Negligence, Strict Liability Defective Design and Strict Liability Failure to Warn.

The parties filed certain pre-trial motions and made certain objections at trial which dispositions are germane to this appeal, including the trial court's rejection of Monsanto's assertion that Appellees' Failure to Warn claim was preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq*, and denial of Monsanto's request to exclude evidence and argument relating to the Ninth Circuit Court of Appeals' decision in ***Natural Resources Defense Council v. U.S. Environmental Protection Agency***, 38 F.4th 34 (9th Cir. 2022) ("***NRDC***").

The parties proceeded to a jury trial after which, on October 27, 2023, the jury found in Appellees' favor on their negligence claim. With respect to Appellees' Failure to Warn claim, the jury found that Roundup was defective because it lacked proper warnings and instructions for safe use.[1] The jury awarded Appellees $25 million in compensatory damages and $150 million in punitive damages after finding that Monsanto's conduct was malicious, wanton, willful, or oppressive, or showed reckless indifference to others.

_____

[1] The jury found in Monsanto's favor on the "consumer expectations" aspect of strict liability.

After the jury had rendered its verdict and announced its damages award, Monsanto contacted the individual members of the jury, one of whom ("Juror 9") agreed to have a recorded conversation with Monsanto's counsel. During the recorded conversation, Juror 9 alleged that, as the jury was deliberating, the foreperson contacted a member of the court staff for clarification as to whether "ten yes votes or ten no votes were required" to end deliberations." While the jury waited for the court staff member to consult with the judge, it continued to deliberate. Juror 9 further alleged that, eventually the court staff member told the jury it needed "to reach ten 'no' votes or ten 'yes' votes" and that "if [it] didn't come to ten for one side today, [it] would be called back on Monday and that if [it] didn't reach ten votes either way on Monday, [it] would have to return on Tuesday and if [it] still had not reached ten votes on Tuesday that the judge would call a mistrial on Wednesday." Upon hearing this, Juror 9 alleged that one juror threatened not to return. The votes then shifted, and the jury returned a verdict that afternoon. Subsequent to his recorded conversation with Monsanto's counsel, Juror 9 prepared a notarized written statement recounting these alleged communications and his perception of the jury deliberations after the communications and provided the statement to the court.

Monsanto then filed a motion for recusal, a post-trial motion for JNOV or a new trial, or an evidentiary hearing concerning the alleged conversation between the jury and the court staff member, and other post-trial motions for

JNOV or a new trial. The court denied each of these motions, the prothonotary entered judgment against Monsanto, and this appeal followed.

Monsanto raises the following six issues on appeal:

1. Is a new trial or an evidentiary hearing required based on a juror's sworn statement describing improper and prejudicial *ex parte* communications with the jury during its deliberations?

2. Is a new trial required because the trial court made erroneous and prejudicial evidentiary rulings based on double standards and other improper grounds, resulting in a one-sided trial?

3. Is JNOV required because [Mr. Caranci's] claims are preempted?

4. Is JNOV required because [Appellees] failed to introduce sufficient evidence of specific causation?

5. Is JNOV, a new trial, or remittitur required because the punitive damages award was unwarranted, manifestly excessive, and improperly cumulative?

6. Is JNOV, a new trial, or remittitur required because the compensatory damages award was manifestly excessive and punitive?

Monsanto's Brief at 6.

In each of Monsanto's issues, it challenges the trial court's denial of its post-trial motions for JNOV or a new trial. We review the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. ***Hutchinson v. Penske Truck Leasing Co.***, 876 A.2d 978, 984 (Pa. Super. 2005). In this context, an "[a]buse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill will." ***Id.***

When reviewing the denial of a request for JNOV, the appellate court examines the evidence in the light most favorable to the verdict winner. ***Thomas Jefferson Univ. v. Wapner***, 903 A.2d 565, 569 (Pa. Super. 2006) (citation omitted). Thus, "the grant of [JNOV] should only be entered in a clear case[.]" ***Id.*** (citation omitted).

There are two bases upon which a movant is entitled to JNOV: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." ***Rohm and Haas Co. v. Continental Cas. Co.***, 781 A.2d 1172, 1176 (Pa. 2001) (citation omitted). When an appellant challenges a jury's verdict on this latter basis, we will grant relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." ***Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.***, 126 A.3d 959, 967 (Pa. Super. 2015) (citation omitted).

Similarly, "[o]ur standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion." ***Blumer v. Ford Motor Co.***, 20 A.3d 1222, 1226 (Pa. Super. 2011) (citation omitted). "In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted." ***Id.*** (citation omitted).

***

In its first issue, Monsanto contends that the trial court erred in failing to hold an evidentiary hearing or grant its motion for a new trial because of the alleged improper communication between the jury and a court staff member during the jury's deliberations.

When an *ex parte* communication between the court and the jury takes place, a party is entitled to a new trial if the communication unduly influences the jury's deliberations. **Commonwealth v. Bradley**, 459 A.2d 733, 734 (Pa. 1983) (reviewing civil cases and providing a universal standard to address *ex parte* communications between juries and courts). In **Carter v. U.S. Steel Corp.**, 604 A.2d 1010 (Pa. 1992), our Supreme Court provided the following guidance to determine whether the external communication "unduly influenced" the jury. The Court held:

> In determining the reasonable likelihood of prejudice, the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

*Id.* at 1016-17.

The Court further explained that the standard for assessing prejudicial effect is an objective one:

> Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. Because a trial judge is precluded from considering evidence concerning the subjective impact of an extraneous influence on

> any juror, **it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one.** In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence.

*Id.* at 1016 (emphasis added).

At the outset, we note that because the trial court did not hold a hearing to determine whether the *ex parte* communication described by Juror 9 occurred, we assume for the sake of argument that the court staff member told the jury that it needed ten votes for a verdict and would have to return until it reached a verdict.

Relying on **Briskin v. Lerro Elec. Corp.**, 590 A.2d 362 (Pa. Super. 1991)—a Superior Court decision issued **before** our Supreme Court decided *Carter*, *supra*—Monsanto claims the trial court erred in not granting a new trial because there is a reasonable likelihood, that under an objective standard, the *ex parte* communication prejudiced Monsanto, Juror 9's testimony would be admissible to prove prejudice, and the trial court's reasons for disregarding prejudice were erroneous. Monsanto's Brief at 26-37.

We start by rejecting Monsanto's argument that we should consider Juror 9's perception of the jury deliberations. The Supreme Court in **Carter** emphasized that "the rule in Pennsylvania, as well as in a majority of jurisdictions, is that a juror is incompetent to testify as to what occurred during deliberations." **Carter**, 604 A.2d at 1013 (citing **Pittsburgh National Bank v. Mutual Life. Ins. Co.**, 425 A.2d 383, 385 (Pa. 1981)). This rule is often referred to as the "no impeachment rule." **Id.** However, in order to

accommodate the competing policies in this area, courts have recognized a narrow exception, which permits "post-trial testimony of extraneous influences which might have [prejudiced] the jury during deliberations." ***Pittsburgh National Bank***, 425 A.2d at 386 (citation omitted). Under this exception, **a juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations.** *Id.* Under no circumstances may jurors testify regarding their subjective reasoning processes.[2]

Thus, our analysis of Monsanto's claim is limited to an objective consideration of whether the court staff member's statement about the number of jurors needed to reach a verdict and the length of time the court would require the jurors to deliberate before declaring a mistrial unduly influenced the jurors. Applying the test set forth in ***Carter*** to determine whether the communication unduly influenced the jurors, we find that this communication did not do so. The statement pertained to court procedure and did not address any substantive issues. Furthermore, using an objective standard, we find that the statement regarding the court procedure was not emotional and could not inflame the jury. We, therefore, conclude that, even

_____

[2] To permit a party unhappy with a verdict to hold a hearing about jury deliberations would require the return of every juror and subject the jurors to direct and cross-examination, a process that would unfairly burden jurors who have already given much time to participate in the trial. We trust that the courts can apply the relevant legal authority and determine objectively whether an outside communication unduly prejudiced the jurors.

if the court staff member made the statement, it did not unduly influence the jurors. Monsanto's claim, thus, fails to garner relief.

\*\*\*

In its second issue, Monsanto claims that certain of the trial court's evidentiary rulings resulted in a "one-sided" trial. Monsanto's Brief at 37-53.

Questions of admissibility lie within the trial court's sound discretion, and we will not disturb the court's decision absent a clear abuse of discretion. **Parr v. Ford Motor Co.**, 109 A.3d 682, 690 (Pa. Super. 2014) (citation omitted). "[A]n abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." **Keystone Dedicated Logistics, LLC v. JGB Enters., Inc.**, 77 A.3d 1, 11 (Pa. Super. 2013) (citation omitted).

Monsanto raises four distinct claims of error arising from the trial court's evidentiary rulings.[3] We address those claims *seriatim*.

_____

[3] In addition to the arguments set forth by Monsanto and discussed *infra*, Monsanto also supports its various claims that the trial court erred in its evidentiary rulings by highlighting evidentiary rulings made in other Roundup cases by a different Philadelphia County judge subsequent to the trial in this case. That judge's rulings do not persuade us that the instant trial court—making decisions in the context of this case, with the specific evidence and testimony before it—abused its discretion in its rulings.

\*

First, Monsanto contends that the trial court abused its discretion in preventing it from relying on the result of studies completed by foreign organizations that concluded that glyphosate was not carcinogenic while permitting Appellees to build their case around a "hazard assessment" of glyphosate prepared by the International Agency for Research on Cancer ("IARC"), an organization under the umbrella of the World Health Organization and based in France.  Monsanto's Brief at 38-43.

In support of this claim, Monsanto cites to places in the record where the trial court precluded its **fact** witness, Dr. William Reeves, from testifying about the limitations of the hazard assessment issued by IARC.  *Id.* at 40-42. Monsanto concludes that because Appellees relied on the IARC report to support its claim for punitive damages, Monsanto was "entitled to respond by showing [that] scientists worldwide dismissed IARC's view."  *Id.* at 40. Monsanto further complains that the trial court erred because it permitted extensive testimony about the one foreign organization that agreed with Appellees' position that glyphosate causes cancer but precluded testimony regarding the foreign organizations that found it to be non-carcinogenic, thus, creating a "blatant double standard."  *Id.* at 41.  Monsanto contends that the trial court created an additional "double standard" when it prevented Dr. Reeves from testifying about the manner in which the EPA reacted to IARC because "EPA is not here," yet the court "never applied the same principle to IARC's views, which was also 'not here.'"  *Id.* at 42 (citing N.T., 10/13/23 PM

Session, at 80).[4]  Monsanto concludes that the court's rulings precluded Dr. Reeves from "challenging a core pillar of [Appellees'] theory" and "substantially diminish[ed] its ability to present its case."  *Id.* at 43.

Following our review of the notes of testimony, in particular the instances in which Monsanto alleges the court precluded Dr. Reeves from testifying about the inaccuracies of the IARC hazard assessment, we find no abuse of discretion in the court's ruling.  The notes of testimony reflect vigorous discussion between the court and Monsanto's counsel regarding the nature of Dr. Reeves's testimony—that is whether Dr. Reeves was appearing as a fact or an expert witness—and Monsanto's counsel agreeing that Dr. Reeves was appearing as a fact witness.  *See*, *e.g.* N.T. 10/13/23 AM Session, at 88, 102, 114.

The rulings that Monsanto challenges are those in which Monsanto attempted to elicit expert testimony from Dr. Reeves, including opinions regarding the consequences or effects of research conducted by international regulatory organizations.  Because Dr. Reeves was not qualified as an expert witness and did not prepare an expert report on the consequences or effects of the international regulatory organizations, the trial court properly precluded

_____

[4] Even if the trial court erred in its evidentiary rulings regarding the EPA's conclusions about glyphosate, the error was harmless because Dr. Reeves testified that the EPA viewed glyphosate as either non-carcinogenic or not likely to be carcinogenic.  Monsanto's Brief at 42 (citing N.T., 10/13/23 PM Session, at 91).  This testimony implicitly conveyed EPA's disagreement with and rejection of IARC's finding that glyphosate is a carcinogen.

him from testifying in the capacity of an expert. This claim, thus, warrants no relief.

*

Next, Monsanto claims that the court erred in admitting prejudicial testimony and improperly instructing the jury regarding the ruling of the Ninth Circuit Court of Appeals in **NRDC**, **supra**.[5] Monsanto's Brief at 43-48.

**NRDC** was an administrative appeal in which the Natural Resources Defense Counsel ("NRDC") challenged the EPA's 2020 Interim Registration Review Decision that concluded that "for the most part," glyphosate does not cause cancer. **NRDC**, 38 F.4th at 39. Following its review of the EPA's analysis and conclusions, the Ninth Circuit found, *inter alia*, that, "EPA's errors in assessing human-health risk are serious." **Id**. at 52. In particular, the Court found that the EPA did not adequately consider whether glyphosate causes cancer, and the "EPA's choice of a hazard descriptor [*i.e.*, that glyphosate "for the most part" does not cause cancer] is not supported by substantial evidence." **Id**. at 51. The Ninth Circuit, thus, vacated the human-health portion of the Interim Registration Review Decision and remanded the matter to EPA for further consideration. **Id**. at 52.

Monsanto contends that the **NRDC** holding regarding the EPA Interim Registration Review Decision pertaining to the link between glyphosate and cancer is irrelevant to the instant case. In particular, Monsanto argues that

_____

[5] Monsanto was an intervenor in the case filed by the NRDC.

shortly after the Ninth Circuit decided the case, the EPA reaffirmed its views that glyphosate does not cause cancer. **Monsanto's Br.**, at 43-44. Monsanto further claims that, even if the Ninth Circuit decision were relevant, its prejudicial impact outweighs its probative value because "[l]ay jurors cannot be expected to understand nuanced issues of administrative law." **Id.** at 44. Monsanto asserts that the trial court, nevertheless, permitted Appellees to selectively read parts of the decision to the jury and imply that Monsanto had "executed a legally binding document admitting to [Appellees'] characterization of" the decision.[6] **Id.** at 45 (internal quotation marks omitted).

Monsanto further asserts that the trial court inaccurately stated in open court that "Monsanto is a defendant in a case and there was a ruling, as I understand the testimony, that vacated the registration of the [Roundup], right[?]." Monsanto's Brief at 45 (citing N.T. 10/16/23 AM Session, at 88). Monsanto concludes that the trial court compounded its error by not providing a curative instruction about the inaccuracy until two weeks later when the court charged the jury.

Our review of the record reveals that the trial court permitted Appellees to read portions of the Ninth Circuit's decision when conducting its recross-

_____

[6] The "legally binding document" refers to a stipulation signed by Monsanto lawyers acknowledging that the EPA's 2020 Interim Registration Review Decision was vacated. **See** N.T., 10/13/23 PM Session, at 124, 126. During his recross-examination, Dr. Reeves denied having seen the stipulation. **Id.** at 126.

examination of Dr. Reeves. *See* N.T., 10/16/23 AM Session, at 56-59. On direct, Dr. Reeves had testified about the EPA's Interim Registration Review Decision. Dr. Reeves characterized the Interim Registration Review Decision as a "well-written document" and testified that it gave Monsanto "more confidence in the safety profile of glyphosate." N.T. 10/13/23 PM Session, at 122, 123. Once Monsanto elicited testimony from Dr. Reeves establishing that Monsanto relied on EPA's determination that glyphosate "for the most part" was non-carcinogenic, the court determined that it would not "ignore all of [Dr. Reeves's] previous testimony about his knowledge of the EPA and the significance of the EPA" and, because the jury had "heard testimony on direct and on cross about the wide range of knowledge and the reliance of Monsanto on the regulatory process of the EPA," it would permit Appellees to examine Dr. Reeves regarding the subsequent history of that determination. N.T., 10/16/23 AM Session, at 15.

The trial court further explained that Appellees were permitted to cross-examine Dr. Reeves about the *NRDC* decision because "Monsanto has put all this in play with respect to the efficacy, the procedural substance, all of that Ninth Circuit decision." *Id.* at 16.

We agree with the trial court. Since Dr. Reeves testified that Monsanto relied on the EPA's 2020 Interim Registration Review Decision's determination that glyphosate was "for the most part" non-carcinogenic, the trial court did not abuse its discretion permitting Appellees to recross-examine him about the *NRDC* decision.

- 14 -

With respect to Monsanto's claim that the trial court's curative instruction regarding the court's interpretation of the ***NRDC*** holding was, in essence, too little, too late, our review of the notes of testimony indicates that Monsanto did not place a contemporaneous, specific objection to the court's inaccurate statement about the holding of the ***NRDC*** decision on the record. In fact, Monsanto continued to question Dr. Reeves about the decision.

The following occurred during Monsanto's re-direct examination of Dr. Reeves:

> **Monsanto**: Who actually withdrew the 2020 interim registration review?
>
> **Appellees**: Objection.
>
> **Court**: Are we disputing what the Ninth Circuit opinion said or directed?  OR had a finding? Are you asking this witness to give a legal opinion?
>
> **Monsanto**: No, I am not.  I am not.  I am asking with the - - I'm asking what his understanding as a Monsanto employee is of what the EPA did.
>
> **Appellees**: Objection.
>
> **Court**: Do you have a witness from the EPA or a witness who is going to testify on this subject?
>
> **Monsanto**: Your honor, this goes directly to his work as a Monsanto employee working in regulatory science and what Monsanto did after that opinion came down.
>
> **Court**: All right.  Just so I understand.  Monsanto is a defendant in a case and there was a ruling, as I understood the testimony, that vacated the registration of a product, right?
>
> **Monsanto**: Absolutely not, Your Honor.  Absolutely not.  It was - - absolutely not. . . . It did not vacate the registration of the product.

- 15 -

**Court**: All right.  So you're telling me what this - - you're telling me what the Ninth Circuit opinion said then, right?

**Monsanto**: It says that.  It actually does say that in black and white, Your Honor.

**Court**: That sounds like a yes to me.

**Monsanto**: Absolutely.

**Court**: This witness is not going to testify as to his understanding of the Ninth Circuit because he already testified that he didn't read it and didn't know about it.

NT., 10/16/23 AM Session, at 87-89.  Monsanto's attorney then proceeded to question Dr. Reeves about his understanding of the **NRDC** decision.

It is axiomatic that to "preserve an issue for appellate review, a litigant must place a timely, specific objection on the record.  Issues that are not preserved by specific objection in the lower court are waived."  **Jones v. Ott**, 191 A.3d 782, 787 (Pa. Super. 2018).  In its Brief, Monsanto explained that, "immediately following [the court's] mistake, Monsanto **tried to correct** the court's mistaken view[.]"  Monsanto's Brief at 45 n.13 (emphasis added).  Monsanto's attempt to "correct the court's mistaken view," did not, however, operate as an objection to the court's statement sufficient to preserve this allegation of error for our review.  Because Monsanto failed to place a timely, specific objection to the trial court's statement about the holding of the **NRDC** decision on the record, Monsanto has waived any claim of error about the timing of a curative instruction.  **Jones**, 191 A.3d at 787.

*

Next, Monsanto claims that the trial court abused its discretion in permitting Appellees to introduce inappropriate "propensity" evidence in

- 16 -

violation of Pa.R.E. 404(b). Monsanto's Brief at 48-50. Monsanto asserts that the court should have precluded Appellees from introducing evidence that Monsanto produced—and removed from the market around the same time it introduced Roundup—the chemicals Agent Orange, PCBs, and DDT because it was irrelevant and "suggest[s]a propensity to disregard safety." *Id.* at 49.

Pa.R.E. 404(b)(1) prohibits admission of evidence of "other . . . wrong[s] or act[s]" to show a propensity to act in accordance with a certain trait. Pa.R.E. 404(b)(1). "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2).

Our review of the record, including Monsanto's motion in *limine* and the notes of testimony reveals, that Monsanto did not object to the admission of this evidence on Rule 404(b) grounds. Rather, Monsanto invoked Rules 401 and 403 as grounds for exclusions of this evidence. Monsanto's failure to preserve this specific objection results in its waiver. *Jones*, 191 A3d at 787.

\*

Last, Monsanto contends that the trial court abused its discretion in determining that Monsanto failed to establish a foundation for its alternative theory of causation, *i.e.*, that it was Mr. Caranci's exposure to benzene[7] that caused Mr. Caranci's NHL. Monsanto concludes that this ruling precluded it

---

[7] IARC has labelled benzene a known carcinogen.

from developing its theory through Appellees' causation expert witness. Monsanto's Brief at 50-52.

By way of background, Dr. Timur Durrani, Appellees' expert medical toxicologist, testified that, in calculating Mr. Caranci's exposure to Roundup, he used a methodology that involved multiplying the number of instances that Mr. Caranci used Roundup per year by the hours per instance by the number of years over which he used it. N.T., 10/18/23 AM Session, at 100. On cross-examination, Monsanto asked Dr. Durrani to employ the same methodology to calculate Mr. Caranci's hypothetical exposure to benzene over his 10-year career, assuming that he worked five to six days per year, as a painter.

Monsanto did not present its own expert to establish this theory; rather, it attempted to use Appellees' expert to establish that it was Mr. Caranci's exposure to benzene that caused Mr. Caranci's cancer. In support, Monsanto prepared a slide illustrating Mr. Caranci's hypothetical exposures to benzene, and using Dr. Durrani's Roundup-exposure methodology, Monsanto's attorneys calculated Mr. Caranci's total hypothetical benzene exposures.

Appellees objected on the grounds that neither party had presented evidence of the number of hours, days, or weeks that Mr. Caranci spent painting with paint containing benzene. *Id.* at 102-103. The trial court, however, overruled the objection stating: "I understand. This is a hypothetical that the jury may consider[,] but also may disregard. So just ask your question, please. You're making an assumption, please put it to the witness." *Id.* at 104. When Monsanto's counsel asked Dr. Durrani to calculate, using

his glyphosate exposure methodology, how many benzene exposure events Mr. Caranci had had, Dr. Durrani refused to speculate, explaining, essentially, that it is not appropriate to use the same methodology to gauge benzene exposures and glyphosate exposures. *Id.* at 104-106. Because Dr. Durrani would not speculate about Mr. Carangi's hypothetical exposure to benzene, the trial court did not abuse its discretion in ruling that Monsanto had failed to lay a foundation that would permit an expert opinion that it was benzene that caused Mr. Caranci's NHL.

Additionally, Monsanto's counsel admitted that he had no expert testimony to support the theory that using the glyphosate exposure methodology was the same methodology used to determine benzene exposure. Rather, it was, simply, Monsanto's attorneys' argument that it was appropriate to do so. *Id.* at 105. Ultimately, the trial court disallowed this line of questioning because the benzene exposure calculation was "merely the calculation from counsel," and this was misleading or prejudicial and Monsanto's attorney had not established the proper foundation for it. *Id.* at 106-107.

Following our review, we conclude that the trial court did not abuse its discretion in its ruling. Monsanto failed to provide any evidence to support its position that an expert toxicologist would use or had used the same methodology to calculate the effect of benzene exposures as it would glyphosate exposures or that benzene and glyphosate carry the same risk of cancer. Furthermore, there was nothing in the record to support Monsanto's

attorneys' speculation as to the number of instances of exposure in his time as a painter. Without such a foundation, the trial court properly sustained Monsanto's questioning of Dr. Durrani. Monsanto is, thus, not entitled to relief on this claim.

**\*\*\***

In Monsanto's third issue, it contends that the doctrine of federal preemption bars Appellees' Failure to Warn claim. In support, Monsanto relies on the recent decision of the Third Circuit Court of Appeals in ***Schaffner v. Monsanto Corp.***, 113 F.4th 364 (3rd Cir. 2024), in which that Court, interpreting Pennsylvania law, found that a Pennsylvania duty to warn claim "imposes requirements that are different from those imposed under FIFRA, and [the plaintiff's claim] is therefore preempted by FIFRA." Monsanto's Brief at 53-54 (quoting ***Schaffner***, 113 F.4th at 371). Monsanto contends that, based on the ***Schaffner*** decision alone, "JNOV is required on all of [Appellees'] claims." We reject this contention.

As a prefatory matter, we note that we are "not bound by decisions of the federal Courts of Appeals [although] we may, and at times, do look to them for guidance." ***Miller v. Southeastern Pennsylvania Transp. Auth.***, 103 A.3d 1225, 1231 (Pa. 2014) (citation omitted).

Federal preemption is a question of law; our standard of review is, thus, *de novo*, and our scope of review plenary. ***Dooner v. DiDonato***, 971 A.2d 1187, 1193 (Pa. 2009). By way of background, this Court has explained the doctrine of federal preemption as follows:

The doctrine of federal preemption is founded on the Supremacy Clause. Federal laws are the supreme law of the land; thus, any "state law that conflicts with the federal law is without effect."

A state law is preempted when: (1) Congress expresses a clear intent to preempt state law; (2) when there is outright or actual conflict between the federal and state law; (3) when compliance with the federal and state law is effectively impossible; (4) where there is an implicit federal barrier to state regulation; (5) where Congress has occupied the entire field of regulation; [or] (6) where state law "stands as an obstacle" to the objectives of Congress. The key question is whether Congress intended to preempt state law. Congressional intent may be express or implied:

Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose[.] In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.

Absent express preemption, courts are not to infer preemption lightly, particularly in areas traditionally of core concern to the states such as tort law. This is because the preemption doctrine presumes that police powers historically left to the states are not supplanted by federal law.

*Coffey v. Minwax Co. Inc.*, 764 A.2d 616, 619 (Pa. Super. 2000) (quoting

*Romah v. Hygenic Sanitation Company*, 705 A.2d 841 (Pa. Super. 1998)

(internal quotation marks and ellipses omitted)).

FIFRA contains an express preemption provision at Section 136v(b), which provides that a "[s]tate shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under" FIFRA. 7 U.S.C. § 136v(b). In other words, FIFRA will preempt a state law requirement—including a common-law cause of action— that is not fully consistent with FIFRA's requirements and imposes a duty

greater than that imposed by FIFRA. ***Carson v. Monsanto Company***, 92 F.4th 980, 990-91 (11th Cir. 2024) (citing ***Bates v. Dow Agrosciences LLC***, 544 U.S. 431, 447 (2005)). A state law requirement is not fully consistent with FIFRA's requirements when the state law requirement is: (1) for labeling or packaging; and (2) in addition to or different from what FIFRA requires. 7 U.S.C. § 136v(b); ***Carson***, 92 F.4th at 989-91 (citing ***Bates***, 544 U.S. at 444, 446-47).

We start with a discussion of the elements of a Pennsylvania failure to warn claim. A claim for strict liability failure to warn under Pennsylvania law requires a plaintiff to prove, *inter alia*, that a product "lacks adequate warnings or instructions necessary for safe use of the product." ***Zitney v. Wyeth LLC***, 243 A.3d 241, 245 (Pa. Super. 2020) (citation omitted). In other words, Pennsylvania imposes a requirement on manufacturers to provide adequate warnings on its products that are necessary for the consumer's safe use of the product. The issue before us, therefore, is whether FIFRA imposes a similar requirement, *i.e.*, that manufacturers of pesticides provide adequate warnings on their pesticide containers.

Turning to FIFRA's labeling requirements, we start with Section 136a(c)(5)(B) that provides that the Administrator shall register a pesticide if the Administrator determines that the pesticide's **"labeling . . . compl[ies] with the requirements of this subchapter."** 7 U.S.C. § 136a(c)(5)(B) (emphasis added). Among the requirements that FIFRA imposes on a manufacturer of pesticides is that it not distribute or sell "any pesticide which

is adulterated or misbranded." *Id.* at § 136j(a)(1)(E). A pesticide is "misbranded" if its label is inadequate, *i.e.*, if it "does not contain a warning or caution statement [that] may be necessary and if complied with . . . is adequate to protect health and the environment." *Id.* at § 136(q)(1)(G). In other words, FIFRA imposes a requirement on manufacturers of pesticides that they include adequate warnings on its containers of pesticides to protect health and the environment. Otherwise, the product is "misbranded," and the manufacturer is prohibited from selling it.

Since a Pennsylvania failure to warn claim imposes a requirement on manufacturers of pesticides to provide a label that warns of health risks and FIFRA requires manufacturers of pesticides to include on their labels a "warning or caution statement [that is] adequate to protect health and the environment," the requirements are similar and the Pennsylvania failure to warn claim does not impose any requirement that is in addition to the requirements imposed by FIFRA. Thus, FIFRA does not preempt a Pennsylvania failure to warn claim.

This holding is consistent with numerous other courts throughout the United States that have concluded that FIFRA does not preempt their states' failure to warn claims. In *Hardeman v. Monsanto Corporation*, 997 F.3d 941, 995 (9th Cir. 2021), the Ninth Circuit Court of Appeals, determined that California's failure to warn cause of action did not impose any additional requirements to FIFRA's labeling provisions. That Court rejected Monsanto's argument that the EPA's approval of a pesticide label demonstrated that the

label is appropriate. The Court first noted that FIFRA only provides that "registration of a pesticide shall be *prima facie* evidence that the pesticide, its labeling and packaging comply with the registration provision of [FIFRA]." ***Id.*** at 956 (internal quotation marks omitted) (quoting 2 U.S.C. 136a(f)(2)). Thus, approval of the label is not determinative that the label is *per se* adequate.

The Court further noted that to hold otherwise would render the provisions regarding misbranding and mandatory reporting of unreasonable adverse effects superfluous:

> And looking at FIFRA holistically, this makes sense—if mere EPA approval of a label were determinative of FIFRA compliance, then FIFRA's misbranding provision and regulations imposing a duty to report additional factual information regarding unreasonable adverse effects would serve no purpose. So even though EPA approved Roundup's label, a judge or jury could disagree and find that same label violates FIFRA. **And because EPA's labeling determinations are not dispositive of FIFRA compliance, they similarly are not conclusive as to which common law requirements are in addition to or different from the requirements imposed by FIFRA.**

***Id.*** (internal citations and quotation marks omitted; emphasis added).

Similarly, in ***Carson***, 92 F.4th at 992, the Eleventh Circuit concluded that FIFRA did not preempt Georgia's failure to warn claim. The Court found that "FIFRA's labeling requirements that bear on our preemption analysis are its (1) prohibition on misbranding; (2) required registration of pesticides and their labels, and (3) ongoing reporting requirements." ***Id.*** at 990-91. The Court highlighted the provision of FIFRA that defines "misbranding" as a label

- 24 -

that "does not contain a warning or caution statement which is necessary and if complied with . . . is adequate to protect health and the environment." *Id.* at 991-92 (citation omitted).

The Court compared these provisions to a Georgia failure to warn claim. The Court found that "under Georgia common law, a pesticide manufacturer breaches its duty to warn if it fails to provide an adequate warning of the product's potential risks." *Id.* at 992 (citation omitted). The Court then concluded that "here, the practical effect is the same: both FIFRA and Georgia common law require pesticide manufacturers to warn users of potential risks to health and safety." *Id.*

Most recently, a Missouri appellate court rejected Monsanto's argument that FIFRA preempted a Missouri failure to warn claim. That Court held that "the practical effect of both FIFRA's prohibition on misbranding under Section 136(q)(1)(G) and a strict liability failure to warn claim in Missouri are the same: both require a pesticide manufacturer to adequately warn users of the potential dangers of using its product, regardless of the manufacturer's knowledge or intent." *Durnell v. Monsanto*, 707 S.W.3d 828, 833 (Mo. App. E.D. 2025).

Monsanto, however, asks us to accept the reasoning of the *Schaffner* Court and hold that FIFRA preempts a Pennsylvania failure to warn claim. The *Schaffner* Court found that, because the EPA through its pre-approval regulation process, approved Roundup's label without a cancer warning, Monsanto could not add a cancer warning without further EPA approval. 113

F.4th at 399. The Court, therefore, concluded that since the Pennsylvania failure to warn claim, which involves the failure to add a cancer warning, imposes a requirement on Monsanto that FIFRA does not impose, FIFRA preempts Pennsylvania law. *Id.*

We find the *Schaffner* Court's reasoning and conclusion unpersuasive because it relies on only one section of FIFRA and does not consider all the requirements that FIFRA imposes on manufacturers of pesticides regarding adequate labels. The *Schaffner* Court fails to consider the misbranding provisions of FIFRA that prohibit a manufacturer or distributor of a pesticide from distributing or selling "any pesticide [that] is . . . misbranded," which includes selling a pesticide that does not contain an adequate health warning. 7 U.S.C. § 136j(a)(1)(E).

The holding in *Schaffner* implies that EPA's approval of a label is final and determinative that the label adequately warns of risks. We reject this implication. FIFRA provides that EPA approval merely creates a rebuttable presumption of compliance with FIFRA. *See Hardeman*, 997 F.3d at 957 (observing that "FIFRA expressly states that EPA's decision to approve a label during the registration process raises only a rebuttable presumption that the pesticide and its label comply with FIFRA." (citation omitted)). It does not provide that approval by the EPA is dispositive that the manufacturer has complied with FIFRA and, in particular, with the provisions that prohibit selling a pesticide with an inadequate health warning. Additionally, the approval of the label is not a final blessing that the label adequately warns of risks; FIFRA

still requires a manufacturer of a pesticide to provide to the EPA unreasonable adverse effects of the pesticide. 7 U.S.C. § 136d(a)(2).

We might have found **Schaffner** persuasive if FIFRA did not impose any additional obligations on a manufacturer of a pesticide beyond the EPA's approval of the label. However, FIFRA imposes additional requirements on manufacturers; in particular, it requires them not to sell pesticides without adequate health warnings. It is this requirement in FIFRA that is similar to the requirement of Pennsylvania's failure to warn law and, thus, precludes FIFRA from preempting a Pennsylvania failure to warn claim. We, therefore, conclude that FIFRA does not preempt a Pennsylvania failure to warn claim.[8]

_____

[8] Monsanto also baldly asserts in its brief that "**Schaffner** confirms that **Romah v. Hygienic Sanitation Co**, 705 A.2d 841 (Pa. Super. 1997) *aff'd* [] 737 A.2d 249 (1999), was rightly decided and remains good law." Monsanto's Brief at 53 n.15. We disagree that **Romah** remains good law. In **Romah**, this Court found that FIFRA preempted plaintiffs' state law claim that a pesticide manufacturer was negligent in distributing a toxic chemical, which is essentially a claim that the warnings on the pesticide were not sufficient to protect the public from injury. The **Romah** Court explained its reasoning as follows: if this "claim was permitted to go to the jury and the jury concluded that the warnings were inadequate, then such a verdict would have the effect of imposing a new labeling requirement . . . an outcome [] expressly preempted by [] FIFRA." **Romah**, 705 A.2d at 852. Subsequently, however, in **Bates**, *supra*, the United States Supreme Court, in considering whether FIFRA permits failure to warn claims disagreed with this reasoning. The **Bates** Court explained that "a requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that merely motivates an optional decision is not a requirement. The proper inquiry calls for an examination of the elements of the common-law duty at issue, not for speculation as to whether a jury verdict will prompt a manufacturer to change its label." **Bates**, 544 U.S. at 432. The Court was clear that "[a] jury verdict that might induce pesticide manufacturers to change labels should not be viewed as a requirement." **Id.** We, thus, decline to find either the **Schaffner** Court's or Monsanto's reliance on **Romah** persuasive.

***

In its fourth issue, Monsanto challenges the sufficiency of Appellees' evidence proving Roundup caused Mr. Caranci's cancer. Monsanto's Brief at 55-58. Monsanto claims that, rather than testify how much Roundup Mr. Caranci actually inhaled or absorbed, Appellees' causation expert, Dr. Durrani, merely "extrapolated from the alleged 'positive association' between glyphosate and cancer to conclude that, because [Mr. Caranci] used Roundup for a number of years, it was the specific cause of his cancer." *Id.* at 56-57. Monsanto assails the expert's "conclusory guesswork based on alleged 'use'" as "unrelated to any actual absorption or alleged effect of glyphosate." *Id.* at 57. Monsanto also claims that Dr. Durrani's testimony regarding Mr. Caranci's Roundup exposure was impermissible "any exposure" opinion. *Id.* at 55-56. For these reasons, Monsanto contends Appellees' evidence was "deficient" and required entry of JNOV. *Id.* at 58. We disagree.

The notes of testimony indicate that Dr. Durrani did not conclude that Mr. Caranci suffers from NHL based solely on the "alleged positive association between glyphosate and cancer." Rather, Dr. Durrani provided extensive testimony explaining how he developed his conclusion regarding causation. Dr. Durrani explained, generally, the process by which exposure to chemicals can damage cellular DNA through oxidative stress, and damaged cells become cancerous. He also discussed specific studies that concluded that glyphosate caused oxidative stress. Then, Dr. Durrani testified that Roundup was a substantial factor in causing Mr. Caranci's cancer based on his calculation that

Mr. Caranci had a history of "high exposure" to glyphosate. N.T., 10/17/23 PM Session, at 45.

Dr. Durrani also explained that he developed a differential diagnosis to determine the cause of Mr. Caranci's NHL.[9] Dr. Durrani concluded Roundup caused Mr. Caranci's NHL only after considering that cause as one of many possible causes and, by process of elimination, ruling out the unlikely or impossible causes. These other possible causes, or preexisting conditions known for making people more susceptible to NHL, considered by Dr. Durrani included: infections, viruses, autoimmune diseases, radiation exposure, family history, personal medical history, occupational hazards, and exposures to carcinogens. Following his review, Dr. Durrani determined to a reasonable degree of medical and scientific certainty that Mr. Caranci's exposure to Roundup caused his NHL. *Id.* at 53. This evidence, which the jury was free to credit, was sufficient to support the jury's conclusion that Roundup caused Mr. Caranci's NHL.

Moreover, with respect to Monsanto's allegation that Dr. Durrani's testimony constituted impermissible "any exposure" opinion testimony, we are not persuaded by Monsanto's misplaced reliance on *Betz v. Pneumo Abex*, 44 A.3d 27 (Pa. 2012). Our Supreme Court in *Betz* considered the

_____

[9] Dr. Durrani testified that a differential diagnosis is "something we use in medicine when we are trying to get an understanding, trying to provide a diagnosis or a cause of a disease." N.T., 10/17/23 PM Session, at 47. Doctors use differential diagnoses to "understand all the possib[le] causes for someone's symptoms] and then [] rank them" to determine which is the most likely cause. *Id.*

trial court's entry of summary judgment in favor of the defendants after the trial court precluded on *Frye* grounds the plaintiff's expert from testifying that because "any" and "every" exposure to asbestos can cause cancer, the defendant's product necessarily caused the plaintiff's cancer. *Id.* at 30, 39-41. The *Betz* court affirmed the trial court's decision, reasoning that the trial court properly determined that the expert's methodology for determining causation was novel and not generally accepted. *Id.* at 58. *Betz* is not a case addressing the sufficiency of the evidence and, thus, does not support Monsanto's assertion that Dr. Durrani's opinion was insufficient to support the verdict in Appellees' favor. This claim, thus, fails.

**\*\*\***

In its fifth issue, Monsanto avers that it is entitled to JNOV or a new trial because the punitive damages awarded to Appellees are unwarranted, excessive, and cumulative. Monsanto's Brief at 58-73.

Pennsylvania juries "enjoy[] discretion in the fixing of punitive damages." *Bert Co. v. Turk*, 298 A.3d 44, 61 (Pa. 2023). That discretion is, however, subject to the limitations of the Fourteenth Amendment's Due Process Clause, which imposes limits on punitive awards based on "[e]lementary notions of fairness . . . dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also to the severity of the penalty that may be imposed." *Id.* at 48 n.2 (internal quotation marks and citation omitted).

In **Bert Co.**, our Supreme Court recently explained punitive damages as follows:

> Punitive damages have long been a part of traditional state tort law. The common-law method for assessing punitive damages has been recognized in every state and federal court for over two hundred years - since before enactment of the Fourteenth Amendment in 1868. They have been described as "quasi-criminal," and could be described as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's [or trial court's (in the case of a non-jury trial)] assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.

**Id.** at 58-59 (citations, some quotation marks, original brackets, and parentheses omitted).

We review an award of punitive damages for an abuse of discretion. **Grossi v. Travelers Personal Ins. Co.**, 79 A.3d 1141, 1157 (Pa. Super. 2013). "Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." **Hollock v. Erie Ins. Exch.**, 842 A.2d 409, 419 (Pa. Super. 2004) (citation and original quotation marks omitted); **see also Grossi**, 79 A.3d at 1157.

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his[, or her,] reckless indifference to the rights of others. In assessing punitive damages, the trier[-]of[-]fact can properly consider the character of the defendant's act, the nature and extent of the harm to the

plaintiff that the defendant caused or intended to cause[,] and the wealth of the defendant.

**Bert Co.**, 298 A.3d at 61-62, (quoting Restatement (Second) of Torts § 908(2)). **See also Hollock**, 842 A.2d at 419 (citing cases addressing Section 908(2); **Grossi**, 79 A.3d at 1157 (same). "Punitive damages awards must be tailored to each defendant." **Bert Co.**, 298 A.3d at 71.

Monsanto raises numerous sub-claims challenging the punitive damages award. First, Monsanto claims punitive damages were improper because Roundup is approved for use by the EPA and the evidence demonstrated that Monsanto acted in accordance with scientific consensus and, therefore, lacked the "evil motive or reckless indifference to the rights of others" necessary to award punitive damages. **Id.** at 59-62 (quoting **Feld v. Merriman**, 485 A.2d 742, 747-48 (Pa. 1984)). Monsanto also contends that the punitive damages award was the result of improper evidence that inflamed the jury. Monsanto's Brief at 63-65.

Monsanto has not cited to any controlling precedent to support its argument that implies that a fact-finder as a matter of law may not impose punitive damages when the defendant acted in accordance with scientific consensus, and we have found none. In fact, this Court has held that "compliance with industry and governmental safety standards **does not**, standing alone, automatically insulate a defendant from punitive damages. **Daniel v. Wyeth Pharmaceuticals, Inc.**, 15 A.3d 909, 932 (Pa. Super. 2011) (emphasis added) (quoting **Phillips v. Cricket Lighters**, 883 A.2d 439, 447 (Pa. 2005)). Simply because Monsanto introduced evidence at trial

that it complied with industry standards and scientific consensus does not preclude the jury from awarding punitive damages and does not require the trial court to enter JNOV.

Additionally, we note that Monsanto is, in essence, arguing that because it introduced evidence of its compliance, the jury, when considering whether to impose punitive damages, should have found its evidence of compliance dispositive and disregarded any evidence Appellees presented. This argument challenges the weight that the jury placed on the evidence of compliance. We cannot and will not reweigh the evidence.

*

Next, in support of its claim that the amount of punitive damages awarded was grossly and unconstitutionally excessive, Monsanto asserts that its conduct was not reprehensible because no evidence suggested that Monsanto demonstrated reckless disregard for the health or safety of others, knew that Roundup, in fact, caused cancer, took advantage of Appellees, or acted with malice. *Id.* at 67-68. Monsanto also notes that the 6:1 ratio of punitive to compensatory damages is "beyond the outermost limit of the due process guarantee." *Id.* at 68. Monsanto next claims that, because Appellees withdrew their request for economic damages, the $25 million compensatory damages award for non-economic damages alone "undeniably contained a punitive component." *Id.* at 68-69. Characterizing the compensatory damages award as "already excessive and substantial," Monsanto argues that **any** multiple of that amount violates due process." *Id.* at 69 (emphasis in

original). Monsanto also asserts that Appellees "improperly invited the jury to award punitive damages based on Monsanto's wealth" by stating that "Monsanto is in the business of making money." *Id.* at 69-70 (citing N.T., 10/10/23 PM Session, at 23).

Monsanto's claim that its conduct was not reprehensible for the reasons it lists is, in essence, a challenge to the weight the jury gave to the evidence presented at trial. The jury heard other evidence about Monsanto's conduct and placed more weight on that evidence. Thus, we decline to reweigh the evidence and do not agree that the jury abused its discretion in awarding $125 million in punitive damages on that basis.

In addition, Monsanto's suggestion—that the $25 million the jury awarded for non-economic compensatory damages must necessarily include a punitive component—is mere conjecture and not grounds for relief. We are likewise unpersuaded by Monsanto's claim that a punitive damages award in an amount six times the compensatory damages award is inherently violative of due process. In fact, the United States Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (Pa. 2003) (citation omitted). The *State Farm* Court further noted that "single-digit multipliers" like the one in the instant case, "are more likely to comport with due process" than multiple-digit multipliers. *Id.* at 410.

Monsanto's final argument within this sub-claim—that Appellees' improperly invited the jury to award excessive punitive damages by stating

that "Monsanto is in the business of making money"—also fails to provide grounds for relief given that it is simply a statement of fact to which Monsanto did not object when Dr. Reeves was asked to, and did, agree to it.  **See** N.T., 10/10/23 PM Session, at 23-24.

*

Monsanto next contends that the punitive damages award was unconstitutionally cumulative based on Monsanto having already paid more than $100 million in punitive damages to plaintiffs in other cases.  **Id.** at 72. Because the $150 million punitive damage award in this case more than doubles the punitive damages paid as punishment for the same conduct, and thousands of Roundup cases remain pending, Monsanto claims the award in this case raises "serious due process" concerns.  **Id.**

As with Monsanto's prior claims, this claim likewise fails as Monsanto has not cited to any authority requiring, as a matter of law, that the trial court remit the punitive damages award simply because juries in other cases awarded other plaintiffs punitive damages against Monsanto.  The trial court neither abused its discretion nor erred as a matter of law in declining to mold the verdict here.

In sum, our review confirms that, in light of the totality of the record developed at trial, the jury properly exercised its discretion in awarding Appellees $125 million in punitive damages and the trial court did not abuse it discretion or err as a matter of law in denying Monsanto's motion for a new trial or JNOV based on the amount of punitive damages awarded.

***

In its final issue, Monsanto claims that the trial court abused its discretion in denying its motion for a new trial, JNOV, or a substantial remittitur because the non-economic compensatory damages awarded were manifestly excessive and punitive. Monsanto's Brief at 74-77. We are guided by the following principles:

> The grant or refusal of a new trial due to the excessiveness of the verdict is within the discretion of the trial court. This Court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. . . . Similarly, our standard of review from the denial of a remittitur is circumspect and judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, the decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur.

*Tong-Summerford v. Abington Mem'l Hosp.*, 190 A.3d 631, 650-51 (Pa. Super. 2018) (citation omitted).

We begin with the premise that large verdicts are not necessarily excessive and that each case is unique and dependent on its own particular circumstances. *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 857 (Pa. Super. 2012). "In awarding damages for past or future non-economic loss, a jury may consider, *inter alia*, the age of the plaintiff, the severity of his or her injuries, whether the injuries are temporary or permanent, the duration and

nature of medical treatment, the duration and extent of physical pain and mental anguish on the part of the plaintiff, and the plaintiff's physical condition before the injuries." *Id.* at 857-58 (citation omitted). "Thus, noneconomic loss must be measured by experience rather than any mathematical formula." *Brown v. End Zone, Inc.*, 259 A.3d 473, 486 (Pa. Super. 2021) (citation omitted). "For this reason**, the law entrusts jurors, as the impartial acting voice of the community, to quantify noneconomic loss** and compensation." *Id.* (citation omitted; emphasis added).

With respect to compensatory damages, "this Court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice." *Id.* (citation omitted). A court may consider: "(1) the severity of the injury; (2) whether the Plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the Plaintiff [;] (3) whether the injury will affect the Plaintiff permanently; (4) whether the Plaintiff can continue with his or her employment; (5) the size of the Plaintiff's out-of-pocket expenses; and (6) the amount Plaintiff demanded in the original complaint." *Id.* at 486-87 (citation omitted).

With the above six-factor analysis in mind, Monsanto argues that the non-economic damages awarded were excessive because Appellees introduced no "objective physical evidence," and Mr. Caranci achieved remission and successfully treated recurrences of NHL, sold his business in 2010 at age 70 and introduced no evidence of lost earnings capacity, and introduced no evidence of medical bills or out-of-pocket expenses. Monsanto's

Brief at 75. For these reasons, and because this compensatory damages award was many times greater than "other" large products liability verdicts involving serious illnesses in Pennsylvania and other compensatory damages awards against Monsanto in other jurisdictions, Monsanto claims it is entitled to relief. *Id.*at 76.

Following our review, we conclude that the trial court properly exercised its discretion in denying Monsanto's challenge to the amount of compensatory damages awarded to Appellees. Here, Appellees provided a sufficient evidentiary basis for the jury to conclude that Mr. Caranci suffered, and continued to suffer, disfigurement, pain and suffering, embarrassment, humiliation, and the loss of the ability to enjoy life's pleasures—all non-economic losses recognized under Pennsylvania law. *See Gillingham*, 51 A.3d at 866 (listing non-economic losses compensable under Pennsylvania law).

Mr. Caranci testified extensively about the physical and emotional toll NHL has had on him. In particular, Mr. Caranci testified that he first became sick in 2005 and that his cancer subsequently returned four times, each time with worse symptoms than the time before. N.T., 10/19/23 AM Session, at 76-77, 83, 85. He underwent chemotherapy that was very painful and caused fatigue and nausea. *Id.* at 84. Mr. Caranci testified that his mouth is "dry all the time" and his lips are swollen and dry. *Id.* at 85. To Mr. Caranci, food has no taste and "everything smells like medicine." *Id.* at 88. Mr. Caranci is frail, has difficulty walking, and "can't stand the pain" he experiences in his

daily life. ***Id.*** at 85. The jury also saw that Mr. Caranci has disfiguring lumps all over his body, including on his chin, arms, and groin. ***Id.*** at 82. He is embarrassed because he "look[s] like a monster." ***Id.*** He experiences "no happiness, "no joy," does not sleep, and feels defeated by the repeated return of his cancer. ***Id.*** at 84. Mr. Caranci testified that selling the business that he had run for 30 years in 2010 because he was not well enough to run it "[broke] his heart." ***Id.*** at 80.

In light of the record created by Appellees, we conclude that the jury—acting as the impartial voice of the community—fairly and adequately valued Mr. Caranci's non-economic suffering. The award here is not "plainly and excessively exorbitant" and it does not "so shock[] the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." ***Tong-Summerford***, 190 A.3d at 650. Accordingly, we find that the trial court did not err or abuse its discretion in denying Monsanto relief from the compensatory damages award.

***

In conclusion, we find that none of the issues raised by Monsanto entitles it to relief. We, therefore, affirm the entry of judgment in Appellees favor.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>5/8/2025</u>